# UNITED STATES *v.* UNITED STATES GYPSUM CO. ET AL.

No. 76–1560.   Argued March 1, 1978—Decided June 29, 1978

Burger, C. J., delivered the opinion of the Court, in which Brennan, Marshall, and White, JJ., joined; in all but Part IV of which Stewart, J., joined; in Parts I, II, V, and a portion of Part III of which Powell, J., joined; in Part I and a portion of Part V of which Rehnquist, J., joined; and in all but Part II of which Stevens, J., joined. Powell, J., filed an opinion concurring in part, *post,* p. 469. Rehnquist, J., *post,* p. 471, and Stevens, J., *post,* p. 474, filed opinions concurring in part and dissenting in part. Blackmun, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the briefs were *Solicitor*

*General McCree, Assistant Attorney General Shenefield, Frank H. Easterbrook, Robert B. Nicholson, Rodney O. Thorson,* and *Robert J. Wiggers.*

*H. Francis DeLone, W. Donald McSweeney,* and *Fred H. Bartlit, Jr.,* argued the cause for respondents. With them on the briefs were *Stephen A. Stack, Jr., Mari M. Gursky, William A. Montgomery, Joseph R. Lundy, Thomas A. Gottschalk, Robert C. Keck, James G. Hiering, Cloyd R. Mellott, William B. Mallin, J. Gary Kosinski, D. Richard Funk, Clark M. Clifford, Carson M. Glass,* and *Thomas Richard Spradlin.**

*A brief of *amici curiae* urging reversal was filed for their respective States by *Evelle J. Younger,* Attorney General of California, *Sanford N. Gruskin,* Chief Assistant Attorney General, *Warren J. Abbott,* Assistant Attorney General, and *Michael I. Spiegel* and *Charles M. Kagay,* Deputy Attorneys General; *William J. Baxley,* Attorney General of Alabama, and *Thomas Troy Zieman, Jr., Jerry L. Weidler,* and *Susan Beth Farmer,* Assistant Attorneys General; *Bruce E. Babbitt,* Attorney General of Arizona, and *Alison B. Swan,* Assistant Attorney General; *J. D. McFarlane,* Attorney General of Colorado, and *Robert F. Hill,* First Assistant Attorney General; *Carl R. Ajello,* Attorney General of Connecticut; *Theodore L. Sendak,* Attorney General of Indiana; *Curt Schneider,* Attorney General of Kansas, and *Thomas W. Regan,* Assistant Attorney General; *William J. Guste, Jr.,* Attorney General of Louisiana; *Francis B. Burch,* Attorney General of Maryland; *John Ashcroft,* Attorney General of Missouri; *William F. Hyland,* Attorney General of New Jersey; *Toney Anaya,* Attorney General of New Mexico; *Louis J. Lefkowitz,* Attorney General of New York, and *John M. Desiderio,* Assistant Attorney General; *Rufus L. Edmisten,* Attorney General of North Carolina, and *David S. Crump,* Special Deputy Attorney General; *James A. Redden,* Attorney General of Oregon, and *Stephen L. Dunne; John L. Hill,* Attorney General of Texas; *Robert B. Hansen,* Attorney General of Utah; *M. Jerome Diamond,* Attorney General of Vermont; *Anthony F. Troy,* Attorney General of Virginia; *Slade Gorton,* Attorney General of Washington, and *Thomas L. Boeder,* Assistant Attorney General; *Bronson C. LaFollette,* Attorney General of Wisconsin, and *Michael L. Zaleski,* Assistant Attorney General.

*Stanley T. Kaleczyc, Lawrence B. Kraus,* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

Mr. Chief Justice Burger delivered the opinion of the Court.

· This case presents the following questions: (a) whether intent is an element of a criminal antitrust offense; (b) whether an exchange of price information for purposes of compliance with the Robinson-Patman Act is exempt from Sherman Act scrutiny; (c) the adequacy of jury instructions on membership in and withdrawal from the alleged conspiracy; and (d) the propriety of an *ex parte* meeting between the trial judge and the foreman of the jury.

## I

Gypsum board, a laminated type of wallboard composed of paper, vinyl, or other specially treated coverings over a gypsum core, has in the last 30 years substantially replaced wet plaster as the primary component of interior walls and ceilings in residential and commercial construction. The product is essentially fungible; differences in price, credit terms, and delivery services largely dictate the purchasers' choice between competing suppliers. Overall demand, however, is governed by the level of construction activity and is only marginally affected by price fluctuations.

The gypsum board industry is highly concentrated, with the number of producers ranging from 9 to 15 in the period 1960–1973. The eight largest companies accounted for some 94% of the national sales with the seven "single-plant producers"[1] accounting for the remaining 6%. Most of the major producers and a large number of the single-plant producers are members of the Gypsum Association which since 1930 has served as a trade association of gypsum board manufacturers.

---

[1] The major producers operate numerous plants to serve a wide range of geographical markets. The single-plant producers are limited in terms of the markets they can serve because of the difficulties and expense involved in long-distance transportation of gypsum board.

## A

Beginning in 1966, the Justice Department, as well as the Federal Trade Commission, became involved in investigations into possible antitrust violations in the gypsum board industry. In 1971, a grand jury was empaneled and the investigation continued for an additional 28 months. In late 1973, an indictment was filed in the United States District Court for the Western District of Pennsylvania charging six major manufacturers and various of their corporate officials with violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1.[2]

The indictment charged that the defendants had engaged in a combination and conspiracy "[b]eginning sometime prior to 1960 and continuing thereafter at least until sometime in 1973," App. 34, in restraint of interstate trade and commerce in the manufacture and sale of gypsum board. The alleged combination and conspiracy consisted of:

"[A] continuing agreement understanding and concert of action among the defendants and co-conspirators to (a) raise, fix, maintain and stabilize the prices of gypsum board; (b) fix, maintain and stabilize the terms and conditions of sale thereof; and (c) adopt and maintain uniform methods of packaging and handling such gypsum board." *Ibid.*

---

[2] The corporate defendants named in the indictment were: United States Gypsum Co., National Gypsum Co., Georgia Pacific Corp., Kaiser-Gypsum Co., Inc., Celotex Corp., and Flintkote Co. The individual defendants included: the Chairman of the Board and the Executive Vice-President of United States Gypsum, the Chairman of the Board and Vice-President for Sales of National Gypsum, the President of Georgia Pacific, the President and the Vice-President and General Manager of Kaiser-Gypsum, the President of Celotex, and the Chairman of the Board and the President of Flintkote. The Gypsum Association was named as an unindicted co-conspirator as were two other gypsum board producers—Johns-Manville Corp. and Fibreboard Corp.

The indictment proceeded to specify some 13 types of actions taken by conspirators "[i]n formulating and effectuating" the combination and conspiracy, the most relevant of which, for our purposes, is specification (h) which alleged that the conspirators

> "telephoned or otherwise contacted one another to exchange and discuss current and future published or market prices and published or standard terms and conditions of sale and to ascertain alleged deviations therefrom."

The bill of particulars provided additional details about the continuing nature of the alleged exchanges of competitive information and the role played by such exchanges in policing adherence to the various other illegal agreements charged.

## B

The first skirmish in the protracted litigation of this case was a motion for dismissal filed by the defendants alleging that their due process rights had been denied because of unreasonable preindictment delay. The District Court, after holding a five-day evidentiary hearing on the motion, concluded that there was "no evidence of unreasonable delay on the part of the Government," 383 F. Supp. 462, 470 (WD Pa. 1974), and that the defendants were not "prejudiced to any extraordinary degree whatsoever by the chain of events leading to this indictment." *Ibid.* The District Court denied a motion to dismiss the indictment. Thereafter nine of the defendants entered pleas of *nolo contendere* and were sentenced.[3] The trial of the remaining seven defendants commenced on March 3, 1975, and lasted some 19 weeks.

---

[3] The remaining corporate defendants were United States Gypsum, National Gypsum, Georgia Pacific, and Celotex, and the remaining individual defendants were the Chairman of the Board and the Vice-President of Sales of National Gypsum and the Executive Vice-President of United States Gypsum.

The focus of the Government's price-fixing case at trial was interseller price verification—that is, the practice allegedly followed by the gypsum board manufacturers of telephoning a competing producer to determine the price currently being offered on gypsum board to a specific customer. The Government contended that these price exchanges were part of an agreement among the defendants, had the effect of stabilizing prices and policing agreed-upon price increases, and were undertaken on a frequent basis until sometime in 1973. Defendants disputed both the scope and duration of the verification activities, and further maintained that those exchanges of price information which did occur were for the purposes of complying with the Robinson-Patman Act[4] and preventing customer fraud. These purposes, in defendants' view, brought the disputed communications among competitors within a "controlling circumstance" exception to Sherman Act liability— at the extreme, precluding, as a matter of law, consideration of verification by the jury in determining defendants' guilt on the price-fixing charge, and at the minimum, making the defendants' purposes in engaging in such communications a threshold factual question.

The instructions on the verification issue given by the trial judge provided that if the exchanges of price information were deemed by the jury to have been undertaken "in a good faith effort to comply with the Robinson-Patman Act," verification standing alone would not be sufficient to establish an illegal price-fixing agreement. The paragraphs immediately following, however, provided that the purpose was essentially irrelevant if the jury found that the effect of verification was to raise,

---

[4] Defendants contended that the exchange of price information or verification was necessary to enable them to take advantage of the meeting-competition defense contained in § 2 (b) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (b) (1976 ed.); see Part III, *infra*.

fix, maintain, or stabilize prices. The instructions on verification closed with the observation:

> "The law presumes that a person intends the necessary and natural consequences of his acts. Therefore, if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result."

The aspects of the charge dealing with the Government's burden in linking a particular defendant to the conspiracy, and the kinds of evidence the jury could properly consider in determining if one or more of the alleged conspirators had withdrawn from or abandoned the conspiracy were also a subject of some dispute between the judge and defense counsel. On the former, the disagreement was essentially over the proper specificity of the charge. Defendants requested a charge directing the jury to determine "what kind of agreement or understanding, if any, existed as to each defendant" before any could be found to be a member of the conspiracy. The trial judge was unwilling to give this precise instruction and instead emphasized at several points in the charge the jury's obligation to consider the evidence regarding the involvement of each defendant individually, and to find, as a precondition to liability, that each defendant was a knowing participant in the alleged conspiracy.[5]

On the matter of withdrawal from the conspiracy, defendants sought an instruction stating explicitly that evidence of vigorous price competition during the period covered by the indictment could be considered by the jury as indicating abandonment of the charged conspiracy by one or more of the defendants. Substantial evidence on this subject had been

---

[5] Relevant portions of the charge dealing with this issue are excerpted in the opinion of the Court of Appeals. 550 F. 2d 115, 127 n. 12 (1977); *id.*, at 137–138 (Weis, J., dissenting).

presented by the defendants in the course of the trial. The judge again was unwilling to accept defendants' construction of the applicable law and substituted an instruction specifying that withdrawal had to be established by either affirmative notice to each other member of the conspiracy or by disclosure of the illegal enterprise to law enforcement officials. The trial judge allowed the defendants to argue their theory of withdrawal to the jury despite his unwillingness to refer to it explicitly in his charge.

C

The jury retired to deliberate early on the evening of Tuesday, July 8, 1975. Supplemental instructions were given in response to questions from the jury on Wednesday and Thursday, and the hours of deliberation were shortened on Friday after the court was informed that some of the jurors were exhausted and not feeling well. On Saturday, after responding to further requests from the jury, the judge, *sua sponte,* in open court, used the supplemental instruction approved by the Court of Appeals [6] to remind the jurors of their obligation to continue the deliberations. Essentially the same instruction was given to the jury again on Sunday, after the judge had received a note detailing the jury's inability to reach a unanimous verdict.

On Monday, the court received yet another note from the jury, this time stating that the foreman wished to "discuss the condition of the Jury" and to seek "further guidance" from the judge. The judge suggested to counsel that he confer privately with the foreman and that a transcript of the meeting be kept but impounded. The judge indicated that if his suggestion was rejected he would simply deny the foreman's request for the meeting. In response to questions from counsel, the judge stated that the purpose of the meeting would be to determine if the jury was in serious physical condition, and

---

[6] See *United States* v. *Fioravanti,* 412 F. 2d 407 (CA3), cert. denied *sub nom. Panaccione* v. *United States,* 396 U. S. 837 (1969).

he further indicated that no instructions on the law would be given to the foreman without calling in the jury and instructing them in open court with counsel present.[7]  After further discussion, all counsel agreed, albeit somewhat reluctantly, to the proposed meeting.

Most of the discussion between the jury foreman and the judge concerned the deteriorating state of health of the jurors after almost five months on the case followed by five days of intensive deliberations and the existence of personality conflicts among the members of the panel.  The foreman also stressed at least twice during the conversation with the judge his belief that the jury was unable to reach a verdict and that further discussion would not eliminate the disagreements which existed.  The judge indicated that while he would take into consideration what the foreman had said, he wanted the jury to continue its deliberations.  Near the close of the meeting, the following colloquy took place:

> "THE COURT.  I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me.  That is all I can say.
>
> "MR. RUSSELL.  I appreciate it.  It is a situation I don't know how to help you get what you are after.
>
> "THE COURT.  Oh, I am not after anything.
>
> "MR. RUSSELL.  You are after a verdict one way or the other.
>
> "THE COURT.  Which way it goes doesn't make any difference to me." [8]

Shortly thereafter, the foreman returned to the jury room and deliberations continued.  The judge then informed counsel, in abbreviated fashion, what had transpired at the meeting with the foreman, and of his direction that the deliberations

---

[7] The judge observed that the only instruction he might give the foreman was "to go back and continue his deliberations."  App. 1823.

[8] The complete colloquy between the foreman and the judge is reproduced as an appendix to this opinion.

continue.[9]  Defense counsel asked to see the transcript of the *in camera* meeting and moved for a mistrial because of the jury's apparent deadlock.  These requests were denied,[10] although the judge indicated that if no verdict were rendered by the following Friday, he would then reconsider the mistrial motions.  The following morning, the jury returned guilty verdicts against each of the defendants.

## D

The Court of Appeals for the Third Circuit reversed the convictions.  550 F. 2d 115 (1977).  The panel was unanimous in its rejection of the claim of preindictment delay, but divided over the proper disposition of the remaining issues.

Two judges agreed that the trial judge erred in instructing the jury that an effect on prices resulting from an agreement to exchange price information made out a Sherman Act violation regardless of whether respondents' sole purpose in engaging in such exchanges was to establish a defense to price-discrimination charges.  Instead, they regarded such a purpose, if certain conditions were met,[11] as constituting a "con-

---

[9] "Significantly, the judge did not tell counsel about the foreman's opinion that the jury was hopelessly deadlocked; did not indicate that the foreman was under the impression that the court wanted a definite verdict either for the prosecution or the defendants; and did not mention the directive to the jury that it should 'see if [it] can come to a verdict.'" 550 F. 2d, at 132 (Adams, J., concurring).

[10] After the conclusion of the trial, the Court of Appeals ordered the transcript of the meeting between the judge and the foreman released to counsel to aid them in preparation of the appeal.

[11] "Therefore, appellants were entitled to an instruction that their verification practice would not violate the Sherman Act if the jury found: (1) the appellants engaged in the practice solely to comply with the strictures of Robinson-Patman; (2) they had first resorted to all other reasonable means of corroboration, without success; (3) they had good, independent reason to doubt the buyers' truthfulness; and (4) their communication with competitors was strictly limited to the one price and one buyer at issue." *Id.*, at 126.

trolling circumstance" which, under *United States* v. *Container Corp.*, 393 U. S. 333 (1969), would excuse what might otherwise constitute an antitrust violation. One judge considered the instructions regarding the purpose and scope of the conspiracy and the kinds of conduct necessary to demonstrate a withdrawal therefrom to be infirm, while another concluded that the convictions should be reversed because the trial judge "improperly induced" the jury into reaching a verdict during the *in camera* conversation with the foreman.

One judge, in dissent, would have sustained the convictions. He regarded the charge on verification to be consistent with *Container Corp.*, and rejected the notion that the Robinson-Patman Act required the exchange of price information even in the limited circumstances identified by the majority. Neither of the alleged infirmities in the general conspiracy instructions, in his view, afforded any basis for reversal, and he disagreed with the characterization of the trial judge's conduct as coercing a verdict.

We granted certiorari, 434 U. S. 815 (1977), and we affirm.

## II

We turn first to consider the jury instructions regarding the elements of the price-fixing offense charged in the indictment. Although the trial judge's instructions on the price-fixing issue are not without ambiguity, it seems reasonably clear that he regarded an effect on prices as the crucial element of the charged offense. The jury was instructed that if it found interseller verification had the effect of raising, fixing, maintaining, or stabilizing the price of gypsum board, then such verification could be considered as evidence of an agreement to so affect prices. They were further charged, and it is this point which gives rise to our present concern, that "if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, *as a matter of law,* to have intended that result." App. 1722. (Emphasis added.)

The Government characterizes this charge as entirely consistent with "this Court's long-standing rule that an agreement among sellers to exchange information on current offering prices violates Section 1 of the Sherman Act if it has either the purpose or the effect of stabilizing prices," Reply Brief for United States 1, and relies primarily on our decision in *United States* v. *Container Corp., supra,* a civil case, to support its position. See also *American Column & Lumber Co.* v. *United States,* 257 U. S. 377 (1921); *United States* v. *American Linseed Oil Co.,* 262 U. S. 371 (1923); *Maple Flooring Mfg. Assn.* v. *United States,* 268 U. S. 563 (1925); *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588 (1925). In this view, the trial court's instructions would not be erroneous, even if interpreted, as they were by the Court of Appeals, to *direct* the jury to convict if it found that verification had an effect on prices, regardless of the purpose of the respondents. The Court of Appeals rejected the Government's "effects alone" test, holding instead that in certain limited circumstances, a purpose of complying with the Robinson-Patman Act would constitute a controlling circumstance excusing Sherman Act liability, and hence an instruction allowing the jury to ignore purpose could not be sustained.

We agree with the Court of Appeals that an effect on prices, without more, will not support a criminal conviction under the Sherman Act, but we do not base that conclusion on the existence of any conflict between the requirements of the Robinson-Patman and the Sherman Acts.[12]   Rather, we hold that a defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices. Cf. *Morissette* v. *United States,* 342 U. S. 246, 274–275 (1952). Since the challenged instruction, as we read it, had this pro-

---

[12] See Part III, *infra.*

hibited effect, it is disapproved. We are unwilling to construe the Sherman Act as mandating a regime of strict-liability criminal offenses.[13]

## A

We start with the familiar proposition that "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States,* 341 U. S. 494, 500 (1951). See also *United States v. Freed,* 401 U. S. 601, 613 (1971) (BRENNAN, J., concurring in judgment); *United States v. Balint,* 258 U. S. 250, 251–253 (1922). In a much-cited passage in *Morissette v. United States, supra,* at 250–251, Mr. Justice Jackson speaking for the Court observed:

> "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution. Unqualified acceptance of this doctrine by English com-

---

[13] Our analysis focuses solely on the elements of a criminal offense under the antitrust laws, and leaves unchanged the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect. See *United States v. Container Corp.,* 393 U. S. 333, 337 (1969); *id.,* at 341 (MARSHALL, J., dissenting). Of course, consideration of intent may play an important role in divining the actual nature and effect of the alleged anticompetitive conduct. See *Chicago Board of Trade v. United States,* 246 U. S. 231, 238 (1918).

mon law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a 'vicious will.'" (Footnotes omitted.)

Although Blackstone's requisite "vicious will" has been replaced by more sophisticated and less colorful characterizations of the mental state required to support criminality, see ALI, Model Penal Code § 2.02 (Prop. Off. Draft 1962), intent generally remains an indispensable element of a criminal offense. This is as true in a sophisticated criminal antitrust case as in one involving any other criminal offense.

This Court, in keeping with the common-law tradition and with the general injunction that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis* v. *United States,* 401 U. S. 808, 812 (1971), has on a number of occasions read a state-of-mind component into an offense even when the statutory definition did not in terms so provide. See, *e. g., Morissette* v. *United States, supra.* Cf. *Lambert* v. *California,* 355 U. S. 225 (1957). Indeed, the holding in *Morissette* can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an interpretative presumption that *mens rea* is required. "[M]ere omission . . . of intent [in the statute] will not be construed as eliminating that element from the crimes denounced"; instead Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor, and "absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them." 342 U. S., at 263.

While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements, see *Shevlin-Carpenter Co.* v. *Minnesota,* 218 U. S. 57 (1910), the limited circumstances in which Congress has created and this Court has recognized such offenses, see *e. g.,*

*United States* v. *Balint, supra; United States* v. *Behrman,* 258 U. S. 280 (1922); *United States* v. *Dotterweich,* 320 U. S. 277 (1943); *United States* v. *Freed, supra,* attest to their generally disfavored status. See generally ALI, Model Penal Code, Comment on § 2.05, p. 140 (Tent. Draft No. 4, 1955); W. LaFave & A. Scott, Criminal Law 222–223 (1972). Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement. In the context of the Sherman Act, this generally inhospitable attitude to non-*mens rea* offenses is reinforced by an array of considerations arguing against treating antitrust violations as strict-liability crimes.

## B

The Sherman Act, unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes.[14] Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed—restraints of trade or commerce and illegal monopolization—without reference to or mention of intent or state of mind. Nor has judicial elaboration of the Act always yielded the clear and definitive rules of conduct which the statute omits; instead open-ended and fact-specific standards like the "rule of reason" have been applied to broad classes of conduct falling within the purview of the Act's general provisions. See, *e. g., Standard Oil Co.* v. *United States,* 221 U. S. 1, 60 (1911); *United*

---

[14] Senator Sherman adverted to the open texture of the statutory language in 1890 and accurately forecast its consequence—a central role for the courts in giving shape and content to the Act's proscriptions.

"I admit that it is difficult to define in legal language the precise line between lawful and unlawful combinations. This must be left for the courts to determine in each particular case. All that we, as lawmakers, can do is to declare general principles, and we can be assured that the courts will apply them so as to carry out the meaning of the law . . . ." 21 Cong. Rec. 2460 (1890).

*States* v. *Topco Associates,* 405 U. S. 596, 607 (1972); *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 49 (1977). Simply put, the Act has not been interpreted as if it were primarily a criminal statute; it has been construed to have a "generality and adaptability comparable to that found to be desirable in constitutional provisions." *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 359–360 (1933). See generally 2 P. Areeda & D. Turner, Antitrust Law § 310 (1978).

Although in *Nash* v. *United States,* 229 U. S. 373, 376–378 (1913), the Court held that the indeterminacy of the Sherman Act's standards did not constitute a fatal constitutional objection to their criminal enforcement, nevertheless, this factor has been deemed particularly relevant by those charged with enforcing the Act in accommodating its criminal and remedial sanctions. The 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws concluded that the criminal provisions of the Act should be reserved for those circumstances where the law was relatively clear and the conduct egregious:

> "The Sherman Act, inevitably perhaps, is couched in language broad and general. Modern business patterns moreover are so complex that market effects of proposed conduct are only imprecisely predictable. Thus, it may be difficult for today's businessman to tell in advance whether projected actions will run afoul of the Sherman Act's criminal strictures. With this hazard in mind, we believe that criminal process should be used only where the law is clear and the facts reveal a flagrant offense and plain intent unreasonably to restrain trade." Report of the Attorney General's National Committee to Study the Antitrust Laws 349 (1955).

The Antitrust Division of the Justice Department took a similar, though slightly more moderate, position in its enforce-

ment guidelines issued contemporaneously with the 1955 Report of the Attorney General's Committee:

> "In general, the following types of offenses are prosecuted criminally: (1) price fixing; (2) other violations of the Sherman Act where there is proof of a specific intent to restrain trade or to monopolize; (3) a less easily defined category of cases which might generally be described as involving proof of use of predatory practices (boycotts for example) to accomplish the objective of the combination or conspiracy; (4) the fact that a defendant has previously been convicted of or adjudged to have been, violating the antitrust laws may warrant indictment for a second offense. . . . The Division feels free to seek an indictment in any case where a prospective defendant has knowledge that practices similar to those in which he is engaging have been held to be in violation of the Sherman Act in a prior civil suit against other persons." [15]   *Id.*, at 350.

While not dispositive of the question now before us, the recommendations of the Attorney General's Committee and the guidelines promulgated by the Justice Department highlight the same basic concerns which are manifested in our general requirement of *mens rea* in criminal statutes and suggest that these concerns are at least equally salient in the antitrust context.

Close attention to the type of conduct regulated by the Sherman Act buttresses this conclusion. With certain exceptions for conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects, see, *e. g., United States v. Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940), the behavior

---

[15] In 1967, the Antitrust Division refined its guidelines to emphasize that criminal prosecutions should only be brought against willful violations of the law. See The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Crime and Its Impact— An Assessment 110 (1967).

proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct. Indeed, the type of conduct charged in the indictment in this case—the exchange of price information among competitors—is illustrative in this regard.[16] The imposition of criminal liability on a corporate official, or for that matter on a corporation directly, for engaging in such conduct which only after the fact is determined to violate the statute because of anticompetitive effects, without inquiring into the intent with which it was undertaken, holds out the distinct possibility of overdeterrence; salutary and procompetitive conduct lying close to the borderline of impermissible conduct might be shunned by businessmen who chose to be excessively cautious in the face of uncertainty regarding possible exposure to criminal punishment for even a good-faith error of judgment.[17] See 2 P. Areeda & D. Turner, Antitrust Law 29

---

[16] The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act. See, *e. g., United States* v. *Citizens & Southern Nat. Bank,* 422 U. S. 86, 113 (1975); *United States* v. *Container Corp.,* 393 U. S., at 338 (Fortas, J., concurring). A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication. See *United States* v. *Container Corp., supra.* See generally L. Sullivan, Law of Antitrust 265–274 (1977). Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act. See *American Column & Lumber Co.* v. *United States,* 257 U. S. 377 (1921); *United States* v. *American Linseed Oil Co.,* 262 U. S. 371 (1923); *United States* v. *Container Corp., supra.*

[17] The possibility that those subjected to strict liability will take extraordinary care in their dealings is frequently regarded as one advantage of a rule of strict liability. See J. Hall, General Principles of Criminal Law

(1978); R. Bork, The Antitrust Paradox 78 (1978); Kadish, Some Observations On the Use of Criminal Sanctions in Enforcing Economic Regulations, 30 U. Chi. L. Rev. 423, 441–442 (1963). Further, the use of criminal sanctions in such circumstances would be difficult to square with the generally accepted functions of the criminal law. See Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401, 422–425 (1958); ALI, Model Penal Code, Comment on § 2.05, p. 140 (Tent. Draft No. 4, 1955). The criminal sanctions would be used, not to punish conscious and calculated wrongdoing at odds with statutory proscriptions, but instead simply to *regulate* business practices regardless of the intent with which they were undertaken.— While in certain cases we have imputed a regulatory purpose to Congress in choosing to employ criminal sanctions, see, *e. g., United States* v. *Balint,* 258 U. S. 250 (1922), the availability of a range of nonpenal alternatives to the criminal sanctions of the Sherman Act negates the imputation of any such purpose to Congress in the instant context.[18] See generally Baker, To Indict or Not To Indict:

---

344 (2d ed. 1960); W. LaFave & A. Scott, Criminal Law 222–223 (1972). However, where the conduct proscribed is difficult to distinguish from conduct permitted and indeed encouraged, as in the antitrust context, the excessive caution spawned by a regime of strict liability will not necessarily redound to the public's benefit. The antitrust laws differ in this regard from, for example, laws designed to insure that adulterated food will not be sold to consumers. In the latter situation, excessive caution on the part of producers is entirely consistent with the legislative purpose. See *United States* v. *Park,* 421 U. S. 658, 671–672 (1975).

[18] Congress has recently increased the criminal penalties for violation of the Sherman Act. Individual violations are now treated as felonies punishable by a fine not to exceed $100,000, or by imprisonment for up to three years, or both. Corporate violators are subject to a $1 million fine. 15 U. S. C. § 1 (1976 ed.). The severity of these sanctions provides further support for our conclusion that the Sherman Act should not be construed as creating strict-liability crimes. Cf. *Morissette* v. *United States,* 342 U. S. 246, 256 (1952); Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55, 72 (1933) (strict liability generally inappropriate when

Prosecutorial Discretion in Sherman Act Enforcement, 63 Cornell L. Rev. 405 (1978).

For these reasons, we conclude that the criminal offenses defined by the Sherman Act should be construed as including intent as an element.[19]

## C

Having concluded that intent is a necessary element of a criminal antitrust violation, the task remaining is to treat the practical aspects of this requirement.[20] As we have noted, the language of the Act provides minimal assistance in determining what standard of intent is appropriate, and the sparse legisla-

offense punishable by imprisonment). Respondents here were not prosecuted under the new penalty provisions since they were indicted prior to the December 21, 1974, effective date for the increased sanctions.

[19] An accommodation of the civil and criminal provisions of the Act similar to that which we approve here was suggested by Senator Sherman in response to Senator George's argument during floor debate that the Act was primarily a penal statute to be construed narrowly in accord with traditional maxims:

"The first section, being a remedial statute, would be construed liberally with a view to promote its object. It defines a civil remedy, and the courts will construe it liberally . . . .

"In providing a remedy the intention of the combination is immaterial. . . .

"The third section is a criminal statute, which would be construed strictly and is difficult to be enforced. In the present state of the law it is impossible to describe, in precise language, the nature and limits of the offense in terms specific enough for an indictment." 21 Cong. Rec. 2456 (1890).

Although the bill being debated by Senators George and Sherman differed in form from the Act as ultimately passed, the colloquy between them indicates that Congress was fully aware of the traditional distinctions between the elements of civil and criminal offenses and apparently did not intend to do away with them in the Act.

[20] In a conspiracy, two different types of intent are generally required—the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy. See W. LaFave & A. Scott, Criminal Law 464–465 (1972). Our discussion here focuses only on the second type of intent.

tive history of the criminal provisions is similarly unhelpful. We must therefore turn to more general sources and traditional understandings of the nature of the element of intent in the criminal law. In so doing, we must try to avoid "the variety, disparity and confusion" of judicial definitions of the "requisite but elusive mental element" of criminal offenses. *Morissette* v. *United States,* 342 U. S., at 252.

The ALI Model Penal Code is one source of guidance upon which the Court has relied to illuminate questions of this type. Cf. *Leary* v. *United States,* 395 U. S. 6, 46 n. 93 (1969); *Turner* v. *United States,* 396 U. S. 398, 416 n. 29 (1970). Recognizing that *"mens rea* is not a unitary concept," *United States* v. *Freed,* 401 U. S., at 613 (BRENNAN, J., concurring in judgment), the Code enumerates four possible levels of intent—purpose, knowledge, recklessness, and negligence. In dealing with the kinds of business decisions upon which the antitrust laws focus, the concepts of recklessness and negligence have no place. Our question instead is whether a criminal violation of the antitrust laws requires, in addition to proof of anticompetitive effects, a demonstration that the disputed conduct was undertaken with the "conscious object" of producing such effects, or whether it is sufficient that the conduct is shown to have been undertaken with knowledge that the proscribed effects would most likely follow. While the difference between these formulations is a narrow one, see ALI, Model Penal Code, Comment on § 2.02, p. 125 (Tent. Draft No. 4, 1955), we conclude that action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws.[21]

---

[21] In so holding, we do not mean to suggest that conduct undertaken with the purpose of producing anticompetitive effects would not also support criminal liability, even if such effects did not come to pass. Cf. *United States* v. *Griffith,* 334 U. S. 100, 105 (1948). We hold only that this elevated standard of intent need not be established in cases where

Several considerations fortify this conclusion. The element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness.

> "[I]t is now generally accepted that a person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result."
> W. LaFave & A. Scott, Criminal Law 196 (1972).

See also G. Williams, Criminal Law: The General Part §§ 16, 18 (2d ed. 1961); Cook, Act, Intention, and Motive in the Criminal Law, 26 Yale L. J. 645, 653–658 (1917); Perkins, A Rationale of *Mens Rea,* 52 Harv. L. Rev. 905, 910–911 (1939). Generally this limited distinction between knowledge and purpose has not been considered important since "there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the results." LaFave & Scott, *supra,* at 197. See also ALI, Model Penal Code, Comment on § 2.02, p. 125 (Tent. Draft No. 4, 1955). In either circumstance, the defendants are consciously behaving in a way the law prohibits, and such conduct is a fitting object of criminal punishment. See 1 Working Papers of the National Commission on Reform of Federal Criminal Laws 124 (1970).

Nothing in our analysis of the Sherman Act persuades us that this general understanding of intent should not be applied to criminal antitrust violations such as charged here. The business behavior which is likely to give rise to criminal antitrust charges is conscious behavior normally undertaken

---

anticompetitive effects have been demonstrated; instead, proof that the defendant's conduct was undertaken with knowledge of its probable consequences will satisfy the Government's burden.

only after a full consideration of the desired results and a weighing of the costs, benefits, and risks. A requirement of proof not only of this knowledge of likely effects, but also of a conscious desire to bring them to fruition or to violate the law would seem, particularly in such a context, both unnecessarily cumulative and unduly burdensome. Where carefully planned and calculated conduct is being scrutinized in the context of a criminal prosecution, the perpetrator's knowledge of the anticipated consequences is a sufficient predicate for a finding of criminal intent.

## D

When viewed in terms of this standard, the jury instructions on the price-fixing charge cannot be sustained. "A conclusive presumption [of intent] which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense." *Morissette, supra,* at 275. The challenged jury instruction, as we read it, had precisely this effect; the jury was told that the requisite intent followed, *as a matter of law,* from a finding that the exchange of price information had an impact on prices. Although an effect on prices may well support an inference that the defendant had knowledge of the probability of such a consequence at the time he acted, the jury must remain free to consider additional evidence before accepting or rejecting the inference. Therefore, although it would be correct to instruct the jury that it may infer intent from an effect on prices, ultimately the decision on the issue of intent must be left to the trier of fact alone. The instruction given invaded this factfinding function.[22]

---

[22] Respondents contend that "prior to the trial of this case, no court had ever held that a mere exchange of information which had a stabilizing effect on prices violated the Sherman Act, regardless of the purpose for the exchange." Joint Brief for Respondents 50. Retroactive application of "this judicially expanded definition of the crime" would, the argument continues, contravene the "principles of fair notice embodied in the Due

## III

Our construction of the Sherman Act to require proof of intent as an element of a criminal antitrust violation leaves

Process Clause." *Ibid.* While we have rejected on other grounds the "effects only" test in the context of criminal proceedings, we do not agree with respondents that the prior case law dealing with the exchange of price information required proof of a purpose to restrain competition in order to make out a Sherman Act violation.

Certainly our decision in *United States* v. *Container Corp.*, 393 U. S. 333 (1969), is fairly read as indicating that proof of an anticompetitive effect is a sufficient predicate for liability. In that case, liability followed from proof that "the exchange of price information has had an anticompetitive effect in the industry," *id.*, at 337, and no suggestion was made that proof of a purpose to restrain trade or competition was also required. Thus, at least in the post-*Container* period, which comprises almost the entire time period at issue here, respondents' claimed lack of notice cannot be credited.

Nor are the prior cases treating exchanges of information among competitors more favorable to respondents' position. See *American Column & Lumber Co.* v. *United States*, 257 U. S., at 400 ("[A]ny concerted action . . . to cause, or which in fact does cause, . . . restraint of competition . . . is unlawful"); *United States* v. *American Linseed Oil Co.*, 262 U. S. 371, 389 (1923) ("[A] necessary tendency . . . to suppress competition . . . [is] unlawful"); *Maple Flooring Mfrs. Assn.* v. *United States*, 268 U. S. 563, 585 (1925) (purpose to restrain trade or conduct which "had resulted, or would necessarily result, in tending arbitrarily to lessen production or increase prices" sufficient for liability). While in *Cement Mfrs. Protective Assn.* v. *United States*, 268 U. S. 588 (1925), an exception from Sherman Act liability was recognized for conduct intended to prevent fraud, we do not read that case as repudiating the rule set out in prior cases; instead *Cement* highlighted a narrow limitation on the application of the general rule that either purpose or effect will support liability.

We do not understand respondents to be making the related claim that they relied on the several lower court cases exempting interseller verification for purposes of complying with the Robinson-Patman Act from scrutiny under the Sherman Act, see *infra*, at 452–453, and thus should not be penalized if those decisions turn out to have been incorrect. Whatever the merits of such an argument, respondents would appear unable to invoke it since the initiation of their verification practices antedated those lower court decisions.

unresolved the question upon which the Court of Appeals focused, whether verification of price concessions with competitors for the sole purpose of taking advantage of the § 2 (b) meeting-competition defense should be treated as a "controlling circumstance" precluding liability under § 1 of the Sherman Act. We now turn to that question.[23]

## A

In *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588 (1925), the Court held exempt from Sherman Act § 1 liability an exchange of price information among competitors because the exchange of information was necessary to protect the cement manufacturers from fraudulent behavior by contractors.[24] Over 40 years later, in *United States* v. *Container Corp.,* 393 U. S., at 335, Mr. Justice Douglas characterized the *Cement* holding in the following terms:

"While there was present here, as in *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588, an exchange of prices to specific customers, there was absent the con-

---

[23] This question was not resolved by the prior discussion because a purpose of complying with the Robinson-Patman Act by exchanging price information is not inconsistent with knowledge that such exchanges of information will have the probable effect of fixing or stabilizing prices. Since we hold knowledge of the probable consequences of conduct to be the requisite mental state in a criminal prosecution like the instant one where an effect on prices is also alleged, a defendant's purpose in engaging in the proscribed conduct will not insulate him from liability unless it is deemed of sufficient merit to justify a general exception to the Sherman Act's proscriptions. Cf. *Cement Mfrs. Protective Assn.* v. *United States, supra.*

[24] Respondents maintain that their verification practices not only were for the purpose of complying with the Robinson-Patman Act, but also served to protect them, from fraud on the part of their customers, and thus fall squarely within the *Cement* exception. The Court of Appeals rejected this claim, 550 F. 2d, at 123 n. 9, and we find no reason to upset this determination.

trolling circumstance, *viz.*, that cement manufacturers, to protect themselves from delivering to contractors more cement than was needed for a specific job and thus receiving a lower price, exchanged price information as a means of protecting their legal rights from fraudulent inducements to deliver more cement than needed for a specific job."

The use of the phrase "controlling circumstance" in *Container Corp.* implied that the exception from Sherman Act liability recognized in *Cement Mfrs.* was not necessarily limited to the special circumstances of that case, although the exact scope of the exception remained largely undefined.

Since *Container Corp.*, several courts have read the controlling-circumstance exception as encompassing exchanges of price information when undertaken for the purpose of compliance with § 2 (b) of the Clayton Act, as amended by the Robinson-Patman Act. See, *e. g., Belliston* v. *Texaco, Inc.*, 455 F. 2d 175, 181–182 (CA10 1972); *Wall Products Co.* v. *National Gypsum Co.*, 326 F. Supp. 295, 312–315 (ND Cal. 1971).[25] The Court of Appeals in the instant case essentially adopted the same tack—albeit with some additional limitations[26]—finding such a step necessary to eliminate a perceived conflict between the Sherman Act's proscriptions regarding the exchange of price information among competitors and the claimed necessity of such exchanges to perfect the § 2 (b) defense. The Government challenges that resolution on two grounds: first, that there is no general controlling-circumstance exception to the Sherman Act, and second, that, in any event, there is no conflict between the two antitrust statutes which would require the prohibitions of the Sherman Act to

[25] Although the *Belliston* court did not specifically refer to *Cement's* "controlling circumstance" exception, it adopted the rationale of the *Wall Products* case where that exception was explicitly relied upon to immunize verification from the proscriptions of the Sherman Act.

[26] See n. 11, *supra.*

be tempered even to the degree mandated by the Court of Appeals' carefully circumscribed holding in this case. We agree generally with the Government as to the proper accommodation of the Sherman and Robinson-Patman Acts, and therefore find it unnecessary to address the more general question going to the existence and proper scope of the so-called controlling-circumstance exception.

## B

Section 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (a) (1976 ed.), embodies a general prohibition of price discrimination between buyers when an injury to competition is the consequence. The primary exception to the § 2 (a) bar is the meeting-competition defense which is incorporated as a proviso to the burden-of-proof requirements set out in § 2 (b):

> "*Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

The role of the § 2 (b) proviso in tempering the § 2 (a) prohibition of price discrimination was highlighted in *Standard Oil Co.* v. *FTC,* 340 U. S. 231 (1951). There we recognized the potential tension between the rationales underlying the Sherman and Robinson-Patman Acts and sought to effect a partial accommodation by construing § 2 (b) to provide an absolute defense to liability for price discrimination.

> "We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts. It is enough to say that Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-

defense against a price raid by a competitor. For example, if a large customer requests his seller to meet a temptingly lower price offered to him by one of his seller's competitors, the seller may well find it essential, as a matter of business survival, to meet that price rather than to lose the customer. . . . There is . . . plain language and established practice which permits a seller, through § 2 (b), to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers." 340 U. S., at 249–250.

In *FTC* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746 (1945), the Court provided the first and still the most complete explanation of the kind of showing which a seller must make in order to satisfy the good-faith requirement of the § 2 (b) defense:

"Section 2 (b) does not require the seller to justify price discriminations by showing that in fact they met a competitor's price. But it does place on the seller the burden of showing that the price was made in good faith to meet a competitor's. . . . We agree with the Commission that the statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *Id.*, at 759–760.

Application of these standards to the facts in *Staley* led to the conclusion that the § 2 (b) defense had not been made out. The record revealed that the lower price had been based simply on reports of salesmen, brokers, or purchasers with no efforts having been made by the seller "to investigate or verify" the reports or the character and reliability of the informants. 324 U. S., at 758. Similarly, in *Corn Products Co.* v. *FTC*, 324 U. S. 726 (1945), decided the same day, the § 2 (b) defense was not allowed because "[t]he only evidence said to

rebut the *prima facie* case . . . of the price discriminations was given by witnesses who had no personal knowledge of the transactions, and was limited to statements of each witness's assumption or conclusion that the price discriminations were justified by competition." 324 U. S., at 741.

*Staley*'s "investigate or verify" language coupled with *Corn Products*' focus on "personal knowledge of the transactions" have apparently suggested to a number of courts that, at least in certain circumstances, direct verification of discounts between competitors may be necessary to meet the burden-of-proof requirements of the § 2 (b) defense. See *Gray* v. *Shell Oil Co.*, 469 F. 2d 742, 746–747 (CA9 1972); *Belliston* v. *Texaco, Inc.*, 455 F. 2d, at 181–182; *Webster* v. *Sinclair Refining Co.*, 338 F. Supp. 248, 251–252 (SD Ala. 1971); *Wall Products Co.* v. *National Gypsum Co.*, 326 F. Supp., at 312–315; *Di-Wall, Inc.* v. *Fibreboard Corp.*, 1970 Trade Cases ¶ 73,155 (ND Cal. 1970). In none of these cases were the courts called upon to address directly the question of whether interseller verification was actually *required* to satisfy § 2 (b)'s good-faith standard; instead, the issue was presented only obliquely in the form of a defense to the alleged Sherman Act violation. The *Belliston* and *Webster* cases accepted the defense despite the absence of evidence that alternative means of corroborating the claimed price reduction had been exhausted, while the *Gray* and *Wall Products* courts found the communication between sellers permissible only after other alternatives had been exhausted.[27] The Court of Appeals critically and perceptively analyzed these cases and concluded that only a very narrow exception to Sherman Act liability should be recognized; that exception would cover the relatively few situations where the veracity of the buyer seeking the matching discount was legitimately in doubt, other

---

[27] The decision in *Di-Wall* is ambiguous on the question of whether alternatives short of verification were exhausted prior to the exchange of price information. 1970 Trade Cases, ¶ 73,155, p. 88,557.

reasonable means of corroboration were unavailable to the seller, and the interseller communication was for the sole purpose of complying with the Robinson-Patman Act. Despite the court's efforts to circumscribe the scope of the exception it was constrained to recognize, we find its analysis unacceptable.

## C

A good-faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor is sufficient to satisfy the § 2 (b) defense. While casual reliance on uncorroborated reports of buyers or sales representatives without further investigation may not, as we noted earlier, be sufficient to make the requisite showing of good faith, nothing in the language of § 2 (b) or the gloss on that language in *Staley* and *Corn Products* indicates that direct discussions of price between competitors are required. Nor has any court, so far as we are aware, ever imposed such a requirement.[28] See Rowe, Pricing and the Robinson-Patman Act, 41 A. B. A. Antitrust L. J. 98, 100–102 (1971); ABA Section of Antitrust Law, Antitrust Law Developments 145 n. 241 (1975). On the contrary, the § 2 (b) defense has been successfully invoked in the absence of interseller verification on numerous occasions, see, *e. g., International Air Industries, Inc.* v. *American Excelsior Co.,* 517 F. 2d 714, 725–726 (CA5 1975); *Cadigan* v. *Texaco, Inc.,*

---

[28] In *Viviano Macaroni Co.* v. *FTC,* 411 F. 2d 255 (CA3 1969), the § 2 (b) defense was not recognized because the seller had relied solely on the report of its customer regarding other competitive offers without undertaking any investigation to corroborate the offer or the reliability of the customer. The Court of Appeals in the instant case read *Viviano* as at least suggesting, if not requiring, interseller verification when the veracity of the buyer was in doubt. As we read that case, however, it simply reaffirms the teaching of *Staley,* and does not compel the further conclusion that only interseller verification will satisfy the good-faith requirement, even in the particular circumstances identified by the Court of Appeals. See 550 F. 2d, at 135 (Weis, J., dissenting).

492 F. 2d 383 (CA9 1974); *Jones* v. *Borden Co.*, 430 F. 2d 568, 572–574 (CA5 1970); *National Dairy Products Corp.* v. *FTC*, 395 F. 2d 517, 523 (CA7 1968). And in *Kroger Co.* v. *FTC*, 438 F. 2d 1372, 1376–1377 (CA6 1971), aff'g *Beatrice Foods Co.*, 76 F. T. C. 719 (1969), the defense was recognized despite the fact that the price concession was ultimately found to have undercut that of the competition and thus technically to have fallen outside the "meet not beat" strictures of the defense. As these cases indicate, and as the Federal Trade Commission observed, it is the concept of good faith which lies at the core of the meeting-competition defense, and good faith

> "is a flexible and pragmatic, not technical or doctrinaire, concept. . . . Rigid rules and inflexible absolutes are especially inappropriate in dealing with the § 2 (b) defense; the facts and circumstances of the particular case, not abstract theories or remote conjectures, should govern its interpretation and application." *Continental Baking Co.*, 63 F. T. C. 2071, 2163 (1963).

The so-called problem of the untruthful buyer which concerned the Court of Appeals does not in our view call for a different approach to the § 2 (b) defense. The good-faith standard remains the benchmark against which the seller's conduct is to be evaluated, and we agree with the Government and the FTC that this standard can be satisfied by efforts falling short of interseller verification in most circumstances where the seller has only vague, generalized doubts about the reliability of its commercial adversary—the buyer.[29] Given the

---

[29] "Although a seller may take advantage of the meeting competition defense only if it has a commercially reasonable belief that its price concession is necessary to meet an equally low price of a competitor, a seller may acquire this belief, and hence perfect its defense, by doing everything reasonably feasible—short of violating some other statute, such as the Sherman Act—to determine the veracity of a customer's statement that he has been offered a lower price. If, after making reasonable, lawful, inquiries, the seller cannot ascertain that the buyer is lying, the seller is

fact-specific nature of the inquiry, it is difficult to predict all the factors the FTC or a court would consider in appraising a seller's good faith in matching a competing offer in these circumstances. Certainly, evidence that a seller had received reports of similar discounts from other customers, cf. *Jones* v. *Borden Co., supra,* at 572–573; or was threatened with a termination of purchases if the discount were not met, cf. *International Air Industries, Inc.* v. *American Excelsior Co., supra,* at 726; *Cadigan* v. *Texaco, Inc., supra,* at 386, would be relevant in this regard. Efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data would also be probative as would the seller's past experience with the particular buyer in question.[30]

There remains the possibility that in a limited number of situations a seller may have substantial reasons to doubt the accuracy of reports of a competing offer and may be unable to corroborate such reports in any of the generally accepted ways. Thus the defense may be rendered unavailable since unan-

---

entitled to make the sale. . . . There is no need for a seller to discuss price with his competitors to take advantage of the meeting competition defense." (Citations omitted.) Brief for United States 86–87, and n. 78. See also App. to Pet. for Cert. 97a–99a.

[30] It may also turn out that sustained enforcement of § 2 (f) of the Clayton Act, as amended by the Robinson-Patman Act, which imposes liability on buyers for inducing illegal price discounts, will serve to bolster the credibility of buyers' representations and render reliance thereon by sellers a more reasonable and secure predicate for a finding of good faith under § 2 (b). See generally Note, Meeting Competition Under the Robinson-Patman Act, 90 Harv. L. Rev. 1476, 1495–1496 (1977). In both *Great Atlantic & Pacific Tea Co.* v. *FTC,* 557 F. 2d 971 (CA2 1977), and *Kroger* v. *FTC,* 438 F. 2d 1372 (CA6 1971), buyers have been held liable under § 2 (f) despite the fact that the sellers were either found not to have violated the Robinson-Patman Act (*Kroger*) or were not charged with such a violation (*A&P*). Certiorari has been granted in *Great Atlantic & Pacific Tea Co.* to consider the permissibility of enforcing the Robinson-Patman Act in this manner. 435 U. S. 922 (1978).

swered questions about the reliability of a buyer's representations may well be inconsistent with a good-faith belief that a competing offer had in fact been made.[31] As an abstract proposition, resort to interseller verification as a means of checking the buyer's reliability seems a possible solution to the seller's plight, but careful examination reveals serious problems with the practice.

Both economic theory and common human experience suggest that interseller verification—if undertaken on an isolated and infrequent basis with no provision for reciprocity or cooperation—will not serve its putative function of corroborating the representations of unreliable buyers regarding the existence of competing offers. Price concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process. See generally F. Scherer, Industrial Market Structure and Economic Performance 208–209, 449 (1970); P. Areeda, Antitrust Analysis 230–231 (2d ed. 1974); Note, Meeting Competition Under the Robinson-Patman Act, 90 Harv. L. Rev. 1476, 1480–1481 (1977). See also *United States* v. *Container Corp.*, 393 U. S., at 337. Thus, if one seller offers a price concession for the purpose of winning over one of his competitor's customers, it is unlikely that the same seller will freely inform its competitor of the details of the concession so that it can be promptly matched and diffused. Instead, such a seller would appear to have at least as great an incentive to misrepresent the existence

---

[31] We need not and do not decide that in all such circumstances the defense would be unavailable. The case-by-case interpretation and elaboration of the § 2 (b) defense is properly left to the other federal courts and the FTC in the context of concrete fact situations. We note also that our conclusions regarding the proper interpretation of § 2 (f), see n. 30, *supra*, may well affect subsequent application of the § 2 (b) defense.

or size of the discount as would the buyer who received it. Thus verification, if undertaken on a one-shot basis for the sole purpose of complying with the § 2 (b) defense, does not hold out much promise as a means of shoring up buyers' representations.

The other variety of interseller verification is, like the conduct charged in the instant case, undertaken pursuant to an agreement, either tacit or express, providing for reciprocity among competitors in the exchange of price information. Such an agreement would make little economic sense, in our view, if its sole purpose were to guarantee all participants the opportunity to match the secret price concessions of other participants under § 2 (b). For in such circumstances, each seller would know that his price concession could not be kept from his competitors and no seller participating in the information-exchange arrangement would, therefore, have any incentive for deviating from the prevailing price level in the industry. See *United States* v. *Container Corp., supra,* at 336–337. Regardless of its putative purpose, the most likely consequence of any such agreement to exchange price information would be the stabilization of industry prices. See Scherer, *supra,* at 449; Note, Antitrust Liability for an Exchange of Price Information—What Happened to *Container Corp.,* 63 Va. L. Rev. 639, 666 (1977). Instead of facilitating use of the § 2 (b) defense, such an agreement would have the effect of eliminating the very price concessions which provide the main element of competition in oligopolistic industries and the primary occasion for resort to the meeting-competition defense.

Especially in oligopolistic industries such as the gypsum board industry, the exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions. The Department of Justice's 1977 Report on the Robinson-Patman Act focused on the growing use of the Act as a cover for price fixing; former

Antitrust Division Assistant Attorney General Kauper discussed the mechanics of the process:

"And thus you find in some industries relatively extensive exchanges of price information for the purpose, at least the stated purpose, of complying with the Robinson-Patman Act . . . .

"Now, the mere exchange of price information itself may tend to stabilize prices. But I think it is also relatively common that once that exchange process begins, certain understandings go along with it—that we will exchange prices, but it will be understood, for example, you will not undercut my prices.

"And from there it is a rather easy step into a fullfledged price-fixing agreement. I think we have seen that from time to time, and I suspect we will continue to see it as long as there continues to be a need to justify particular price discriminations in the terms of the Robinson-Patman Act." United States Department of Justice, Report on the Robinson-Patman Act 58–61 (1977).

We are left, therefore, on the one hand, with doubts about both the need for and the efficacy of interseller verification as a means of facilitating compliance with § 2 (b), and, on the other, with recognition of the tendency for price discussions between competitors to contribute to the stability of oligopolistic prices and open the way for the growth of prohibited anticompetitive activity. To recognize even a limited "controlling circumstance" exception for interseller verification in such circumstances would be to remove from scrutiny under the Sherman Act conduct falling near its core with no assurance, and indeed with serious doubts, that competing antitrust policies would be served thereby. In *Automatic Canteen Co.* v. *FTC,* 346 U. S. 61, 74 (1953), the Court suggested that as a general rule the Robinson-Patman Act should be construed so as to insure its coherence with "the broader antitrust policies that have been laid down by Congress"; that observation

buttresses our conclusion that exchanges of price information—even when putatively for purposes of Robinson-Patman Act compliance—must remain subject to close scrutiny under the Sherman Act.[32]

## IV

One judge of the Court of Appeals was of the view that reversal was required not only because of infirmities in the antitrust instruction, but also because the trial judge had "encroach[ed] on [the] jury[ 's] authority" and had foreclosed "a possible 'no verdict' outcome." 550 F. 2d, at 134 (Adams, J., concurring). Our own review of the record and the circumstances surrounding the deliberations of the jury, and in particular the *ex parte* communications between the judge and jury foreman, leads us to the same conclusion.

After hearing a mass of testimony for nearly five months, the jurors were sequestered when deliberations commenced. On the second and third days of deliberations, supplemental instructions were given in response to jury questions; on the fourth day, the hours of deliberations were shortened because of reported nervous tension among the jurors; on the fifth day, the judge *sua sponte* delivered what amounted to a modi-

---

[32] That the § 2 (b) defense may not be available in every situation where a competing offer has in fact been made is not, in our view, a meaningful objection to our holding. The good-faith requirement of the § 2 (b) defense implicitly suggests a somewhat imperfect matching between competing offers actually made and those allowed to be met. Unless this requirement is to be abandoned, it seems clear that inadequate information will, in a limited number of cases, deny the defense to some who, if all the facts had been known, would have been entitled to invoke it. For reasons already discussed, interseller verification does not provide a satisfactory solution to this seemingly inevitable problem of inadequate information. Moreover, § 2 (b) affords only a defense to liability and not an affirmative right under the Act. While sellers are, of course, entitled to take advantage of the defense when they can satisfy its requirements, efforts to increase its availability at the expense of broader, affirmative antitrust policies must be rejected.

fied *Allen* charge [33] in the course of providing further answers to questions from the jury; and on the sixth day, the modified *Allen* charge was repeated, this time in response to a note from the jury that it was unable to reach a verdict. Against this background of internal pressures and apparent disagreements and confusion among the jurors, the jury foreman, on the morning of the seventh day of deliberations, requested a meeting with the judge "to discuss the condition of the Jury and further guidance." The District Judge suggested that he meet alone with the jury foreman and counsel acquiesced. The transcript of the meeting, which was initially impounded but released for purposes of the appeal, contained several references by the foreman to the jury's deadlock, as well as an exchange suggesting the strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict "one way or the other." The judge's report to counsel summarizing the discussion made no reference to either of these matters. [34]

We find this sequence of events disturbing for a number of reasons. Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements. Second,

---

[33] *Allen* v. *United States,* 164 U. S. 492 (1896). An injunction to the jury "to deliberate with a view toward reaching an agreement if you can, without violence, to individual judgment," was also included in the judge's original instruction prior to the commencement of deliberations.

[34] See n. 9, *supra.*

any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants. Here, there developed a set of circumstances in which it can fairly be assumed that the foreman undertook to restate to his fellow jurors what he understood the judge to have implied regarding the resolution of the case in a definite verdict "one way or the other." There is, of course, no way to determine precisely what the foreman said when he returned to the jury room.

Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel. While all counsel acquiesced to the judge's *ex parte* conference with the jury foreman, they did so on the express understanding that the judge merely intended—as no doubt at the time he did—to receive from the foreman a report on the state of affairs in the jury room and the prospects for a verdict. Certainly none of the parties waived the right to a full and accurate report of what transpired at the meeting nor did they agree that the judge was to repeat the instructions as to his understandable reluctance to accept the jury's inability to reach a verdict. Because neither counsel received a full report from the judge, they were not aware of the scope of the conversation between the foreman and the judge, of the judge's statement that the jury should continue to deliberate in order to reach a verdict, or of the real risk that the foreman's impression was that a verdict "one way or the other" was required. Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction. See *Rogers* v. *United States,* 422 U. S. 35, 38 (1975); *Fillippon* v. *Albion Vein Slate Co.,* 250 U. S.

76, 81 (1919). Thus, it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is—which constitutes the error; rather, it is the fact that the *ex parte* discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

While it is, of course, impossible to gauge what part the disputed meeting played in the jury's action of returning a verdict the following morning, this swift resolution of the issues in the face of positive prior indications of hopeless deadlock, at the very least, gives rise to serious questions in this regard. Cf. *Rogers* v. *United States, supra,* at 40–41. In *Jenkins* v. *United States,* 380 U. S. 445 (1965), we held an instruction directing the jury that it *had to* reach a verdict was reversible error; the logic of *Jenkins* cannot be said to be inapposite here, given the peculiar circumstances in which discussions between the judge and the foreman took place.

We are persuaded that the Court of Appeals would have been justified in reversing the convictions solely because of the risk that the foreman believed the court was insisting on a dispositive verdict; a belief which we must assume was promptly conveyed to the jurors. The unintended direction of the colloquy between the judge and the jury foreman illustrates the hazards of *ex parte* communications with a deliberating jury or any of its members.

## V

Respondents also challenged in the Court of Appeals the jury instructions regarding participation in the conspiracy and withdrawal therefrom; one judge on the panel concluded that these instructions were infirm. We agree with the Govern-

ment that the charge concerning participation in the conspiracy, while perhaps not as clear as it might have been, was sufficient. The jury was informed repeatedly that only a single conspiracy was alleged and that liability could only be predicated on the knowing involvement of each defendant, considered individually, in the conspiracy charged. As given,[35] the instruction was substantially in accord with those generally given in similar antitrust cases. See ABA Antitrust Section, Jury Instructions in Criminal Antitrust Cases 1964–1976, chs. 10, 28 (1978); 2 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions §§ 55.09, 55.17 (3d ed., 1977). And in any event, the disputed instruction differed in only minor and immaterial respects from the instruction requested by respondents.[36]

We have more difficulty with the instruction on withdrawal from the conspiracy. The jury was charged in the following terms:

> "In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant *either must have affirmatively notified each other member of the conspiracy*

---

[35] See n. 5, *supra*.

[36] The requested charge was as follows:

"Because the gist of the offense charged is a continuing agreement to raise, fix, maintain and stabilize prices of gypsum products, it is essential for you to determine what kind of agreement or understanding, if any, existed as to each defendant. Each defendant is chargeable with the acts of his or its fellow defendants and alleged co-conspirators only if the acts are done in furtherance of the joint venture as he or it understood it. No defendant is to be held responsible for what some of the alleged conspirators, unknown to the rest, do beyond the reasonable intendment of the common agreement or understanding, if any, to which you may find him or it a party." 550 F. 2d, at 128–129, n. 13 (emphasis omitted).

*he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials.*

"Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise." (Emphasis added).

Respondents had requested a more expansive instruction which would have specifically allowed the jury to consider a "[r]esumption of competitive behavior, such as intensified price cutting or price wars," as affirmative action showing a withdrawal from the price-fixing enterprise. While the judge allowed this theory to be argued to the jury, he declined to include it in his instructions. The Government now seeks to defend the charge as given on the ground that the first sentence was sufficiently broad to satisfy respondents' concerns, and the third sentence, to which respondents principally object, did not in any meaningful way detract from the generality of the first.

We cannot agree. The charge, fairly read, limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy.[37] Nothing that we have been able to find in the case law suggests, much less commands, that such confining blinders be placed on the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy. Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally

---

[37] In this case the obligation to notify "each other member" of the charged conspiracy would be a manageable task; in other situations all "other" members might not be readily identifiable.

been regarded as sufficient to establish withdrawal or abandonment. See, *e. g., Hyde* v. *United States,* 225 U. S. 347, 369 (1912); *United States* v. *Borelli,* 336 F. 2d 376, 385 (CA2 1964). See also Note, Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 958 (1959). We conclude that the unnecessarily confining nature of the instruction, standing alone, constituted reversible error.[38] If a new trial takes place, an instruction correcting this error and giving the jury broader compass on the question of withdrawal must be given.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART joins all but Part IV of this opinion.

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

### APPENDIX TO OPINION OF THE COURT

[Present: The foreman of the jury and the Court.]

The COURT. What is your problem, sir?

Mr. RUSSELL. I have two problems. And first of all, if I refer to a juror with a sexual gender, I would like it struck, because I would like to say juror.

The COURT. In other words, if he says he or she, make it neutral.

Mr. RUSSELL. The two problems are health and the status of the count.

The COURT. You can't tell me that now.

Mr. RUSSELL. I am not going to tell you what the status is in no way. In fact, I can't tell you, because I can't remember.

---

[38] The instruction on withdrawal and proper evidence thereof may have been of particular importance here because respondents vigorously argued throughout the trial that competition within the industry resumed before December 27, 1968, the critical date for purposes of the applicable five-year statute of limitations.

The Court. All right.

Mr. Russell. But first of all, I would like to thank you for that 6:30, because I don't think you would have a jury left. I am not a doctor, but these people are getting very distraught. It is not that they go into a depression and stay there; they go into a depression and they're coming out high. Now I would say at least eight of the jurors are taking some kind of pill. Some of the pills have been even issued by the doctor downstairs. I am not a doctor and I can't judge these things, but I have seen one of [3] these jurors at one time I thought she was going to jump out the window. And I, just for my own sake, without telling you this, I cannot take the responsibility that this could happen. I know this is part of Mr. Keene's job, but like I say, they go high and low, and sometimes by the time I get to Mr. Keene and get him down there, they are perfectly normal again.

In fact, one of the instances was when I saw this one girl—

The Court. May I ask this: If we discharged—we can excuse one juror for health reasons. Is there any juror we could excuse that would help the situation? If it is more than that, there is no point.

Mr. Russell. I think there is more than that, Judge. I am not a doctor, so I can't say. I'm not even sure these are true sicknesses. They seem—I mean, with the high and low, they seem induced, but when a person thinks they are sick, they're generally sick.

The Court. It is just as bad, if they think they are.

Mr. Russell. As I say, I am not a doctor. I don't like to be a judge, but I think for my own sake, my feelings, it is my responsibility as foreman to tell you these things. I do not want to be responsible for anybody's health.

The Court. I don't, either.

[4] You recall, though, that before—when I had two alternate jurors, I asked all the jurors if there was anybody who was not physically able to go ahead and everybody wanted to do it.

Mr. RUSSELL. I realize that. I think every juror out there wants to do their duty.

The COURT. See, we have tried this case now for four months.

Mr. RUSSELL. This is part of it, I will grant you, but it is not the whole part of it. There is some personality conflicts on the jury that have led to certain situations and I think we have overcome those.

The COURT. If we continue to deliberate from 9 to 6:30, with a lunch hour, for a while longer—

Mr. RUSSELL. What I want to tell you next is—and that is, again, my opinion—and you can tell me I am wrong—and I have to look at it in a different way. We have taken enough ballots now, and we have had enough discussions, and the way it is divided is not going to be settled by any document, any remembrance of testimony. It is based on a belief and even if they—even if they would sign a document today, and you would ask me to get up in the jury box and swear I think this is a true and just verdict, I would have to say no, because I believe in the twelve or multiple system of a jury; that if we are to decide beyond a [5] reasonable doubt, when you get twelve, or whatever the number has to be—

The COURT. That is what you have to decide.

Mr. RUSSELL. ———it proves it beyond a shadow of a doubt.

The COURT. Not beyond a shadow of a doubt.

Mr. RUSSELL. I know. Each individual proves it to himself, but for a man to be convicted guilty, or the company, we do it beyond a reasonable doubt, but if you have twelve, you know it is beyond a shadow of a doubt and you cannot have any conscience over it as far as a juror or anything else. That is the way I feel, Judge.

The COURT. What are you suggesting?

Mr. RUSSELL. I am asking you what I should do. I am to the point———

The COURT. I would like this jury to deliberate longer. I

say that because, as I say, we have tried it for a considerable period of time.

Mr. RUSSELL. Everybody realizes that and I do.

The COURT. We have individual people here who are concerned and the jury has now deliberated—they deliberated three full days, Wednesday, Thursday and [6] Friday. They deliberated a half a day on Saturday and a half day on Sunday. They are not deliberating a full day, because jurors usually deliberate until eleven or ten at night.

Mr. RUSSELL. We know that and we want to thank you.

The COURT. You have not deliberated that long yet.

Mr. RUSSELL. I know that is the way you would like it, but what I am trying to tell you is I don't think deliberation is going to change it. It is not a matter of time anymore.

The COURT. Are you telling me this jury is hopelessly deadlocked and will never reach a verdict?

Mr. RUSSELL. In my opinion, it is. I have to rely on that. I have no experience in this kind of thing. I don't know what people go through in a jury. This is the first time I have ever served on one and it is a new experience and I will never forget it. But it is a terrible responsibility and what I said, if it was a matter of finding a document or finding a part of a testimony that would convince somebody, I would say sure, and good.

The COURT. All right.

For the time being continue your deliberations. I will take into consideration what you have told me.

[7] Mr. RUSSELL. As I said, the health problem is something that I think has to be looked at. I don't know how you are going to judge this or whether you call Mr. Keene and ask him or the Marshal's opinion, but I think something ought to be done.

The COURT. All right. I will take it into consideration. I have to talk to counsel.

Mr. RUSSELL. I appreciate that. I didn't expect a decision, but I would like some kind of guidance.

The COURT. I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me. That is all I can say.

Mr. RUSSELL. I appreciate it. It is a situation I don't know how to help you get what you are after.

The COURT. Oh, I am not after anything.

Mr. RUSSELL. You are after a verdict one way or the other.

The COURT. Which way it goes doesn't make any difference to me.

Mr. RUSSELL. They keep saying, "If you will tell him what the situation is, he might accept it."

I said, "He doesn't want to know. He told me that he doesn't want to know what the decision is."

[8] The COURT. No, I don't want to know that. It would not be proper for me to know.

Mr. RUSSELL. You may imply something from what I said.

The COURT. I can imply something from just watching, but I don't want you to tell me. That would be a breach of your duty.

Mr. RUSSELL. I have told you as best I can.

The COURT. Thank you. You tell them to keep deliberating and see if they can come to a verdict.

.[At 12:04 p. m. the jury foreman returned to the deliberation room.]

Certified true and correct transcript.

/s/ MARION C. WIKE

Marion C. Wike

Official Reporter

[App. 1837–1840.]

MR. JUSTICE POWELL, concurring in part.

I join the judgment and Parts I, II, and V of the Court's opinion.[1] I also join so much of Part III as holds that a

---

[1] Because the issue discussed in Part IV of the Court's opinion is unlikely to arise at any retrial, I find it unnecessary to express a view as to it.

seller's intention to establish a meeting-competition defense under § 2 (b) of the Clayton Act, as amended by the Robinson-Patman Act, to a charge of price discrimination under § 2 (a) is not in itself a "controlling circumstance" excusing liability under § 1 of the Sherman Act for otherwise unlawful direct price-verification practices.

I do not join those portions of Part III, however, that might be read as suggesting that there are cases where the § 2 (b) defense is unavailable even though a seller made every reasonable, lawful effort to corroborate his buyer's report that a competitor had offered a lower price before reducing his own price to that buyer. See, *e. g., ante,* at 455–456, 459 n. 32.[2] In my view, a proper accommodation between the policies of the Robinson-Patman Act and the Sherman Act would result in recognition of the § 2 (b) defense in such cases. Otherwise, sellers sometimes would face the unenviable choice of reducing prices to one buyer and risking Robinson-Patman Act liability, refusing to do so and losing the sale, or reducing prices to all buyers.

· A prudent businessman faced with this choice often would forgo the price reduction altogether. This reaction would disserve the procompetitive policy of the Sherman Act without advancing materially the antidiscrimination policy of the Robinson-Patman Act. The Court already has made clear that the Robinson-Patman Act "does not require the seller to justify price discriminations by showing that in fact they met a competitive price." *FTC* v. *A. E. Staley Mfg. Co.,* 324 U. S. 746, 759 (1945). Today the Court confirms. that "it is the concept of good faith which lies at the core of the meeting-competition defense, and good faith 'is a flexible and pragmatic, not technical or doctrinaire, concept.'" *Ante,* at 454, quoting *Continental Baking Co.,* 63 F. T. C. 2071, 2163 (1963). A seller who has attempted to verify his buyer's

---

[2] I do not understand the Court to take a firm position on this issue. See *ante,* at 456 n. 31.

report by every reasonable, lawful means before reducing his price to meet a competitor's price, in my view, has met the test of "good faith." In such a case, if the buyer's report proves to have been untruthful, it is the buyer alone, not the seller, who has acted in bad faith.

MR. JUSTICE REHNQUIST concurring in part and dissenting in part.

I concur in Part I and in the first portion of Part V of the Court's opinion approving the jury instruction on participation in the conspiracy. I dissent from the remaining portions of the opinion and set forth as briefly as possible my reasons for doing so.

Part II of the Court's opinion uses as its point of departure jury instructions on price fixing which the Court correctly characterizes as "not without ambiguity." *Ante*, at 434. However, these jury instructions are but a starting point for the discourse in Part II of the Court's opinion dealing with the element of intent in a criminal case, a discourse which I believe goes beyond any reasoning necessary to dispose of the contentions with respect to that point in this case.

I do not find it necessary to decide the intent which Congress required as a prerequisite for criminal liability under the Sherman Act, because I believe that the instructions given by the District Court, when considered as a whole and in connection with the objections made to them, are sufficiently close to respondents' tendered instructions so as to afford respondents no basis upon which to challenge the verdict. The jury instructions in this case take up some 40 pages of the record and are both detailed and complex. The judge instructed the jury as to both respondents' contention that they exchanged price information solely to comply with the Robinson-Patman Act, and the Government's contention that

> "the Defendants' purpose was not merely to establish their good faith under the Robinson-Patman Act, but that

*they exchanged competitive information for the purpose of raising, fixing, maintaining, and stabilizing prices.*

"It will be up to you, members of the jury, to resolve these issues.

"First, you must determine whether there was an agreement, either implied or express, to engage in the practice of price checking or verification. . . .

.        .        .        .        .

"Secondly, you must determine *whether the purpose* for the exchange of competitive information between the Defendants and their alleged co-conspirators was to insure a good faith meeting of competition, as a defense to the Robinson-Patman Act.

"If you decide that, if you decide that this was *merely done in a good faith effort to comply with the Robinson-Patman Act, then you could not consider verification, standing alone, as establishing an agreement to fix, raise, maintain, and stabilize prices as charged.*

"However, if you decide that the effect of these exchanges was to raise, fix, maintain, and stabilize the price of gypsum wallboard, then you may consider these changes [*sic*] as evidence of the mutual agreement or understanding alleged in the indictment to raise, fix, maintain, and stabilize list prices." App. 1720–1721 (emphasis added).

Read in conjunction with the above, the portions of the instructions quoted by the Court, *ante,* at 430, are not reversible error. The jury was instructed that it must find a purpose "to raise, fix, maintain, and stabilize list prices" and that this purpose could be presumed from the effect of respondents' agreement. Respondents' proposed instruction* does not

_____

*"There has been evidence in this case of a defendant's contacting a competitor to verify the existence or nonexistence of a reported lower price or other competitive condition in the market place. This practice has been referred to as 'verification.' There is evidence that verification was engaged in by defendants for the purpose of compliance with the

significantly differ from that given by the District Court. I might add that in my view it would take plainly erroneous instructions, the error of which was both quite precisely and reasonably pointed out to the District Court, to warrant reversal of a judgment entered upon a jury's verdict following five months of trial.

The portions of Part II which I find most troubling are not those which expressly address the congressionally prescribed requirement of intent for criminal liability under the Sherman Act, but those which discourse at length upon the role of intent in the imposition of criminal liability in general, particularly those which might be taken to import any special constitutional difficulty if criminal liability is imposed without fault. While the Court emphasizes that its result is not constitutionally required, *ante,* at 437, the Court's broad policy statements may be misread by the lower courts. I also feel bound to say that while I am willing to respectfully defer to the views of the distinguished authors of the American Law Institute's Model Penal Code, and to the authors of law review articles and treatises such as those sprinkled throughout the text of Part II of the Court's opinion, I have serious reservations about the undiscriminating emphasis and weight which the Court appears to give them in this case.

For similar reasons, I do not believe that it is necessary in this case to address the interrelationship of the Robinson-Patman Act's meeting-competition defense and the Sherman Act, and I cheerfully refrain from that task. The jury was clearly instructed that if price information was exchanged "in a good faith effort to comply with the Robinson-Patman Act,"

---

Robinson-Patman Act, one of the federal antitrust laws. I charge you as a matter of law that no finding of guilt may be made in this case based on verification engaged in for the purpose of compliance with the Robinson-Patman Act. Further, to consider verification as any evidence whatsoever of an alleged price-fixing conspiracy you must first determine beyond a reasonable doubt that the purpose of verification was *not* compliance with the Robinson-Patman Act." App. 1857.

this exchange by itself would not make out a violation of the Sherman Act. I believe that the communications between the judge and the jury foreman described in Part IV of the Court's opinion, having been consented to by all parties to the case, would not justify a reversal of the verdict of the jury. I agree with that portion of Part V of the Court's opinion which approves the charge given the jury concerning participation in the conspiracy, but disagree with that portion of Part V which seems to approve a more expansive instruction with respect to withdrawal from the conspiracy. In my opinion, neither of these instructions of the District Court was sufficient, either separately or together, to warrant reversal of the jury's verdict of guilty.

I therefore conclude that the judgment of the Court of Appeals should be reversed, and the judgment of the District Court based upon the jury's verdict should be reinstated.

MR. JUSTICE STEVENS, concurring in part and dissenting in part.

There are three reasons why I am unable to subscribe to the bifurcated construction of § 1 of the Sherman Act which the Court adopts in Part II of its opinion.

In 1955 I subscribed to the view that criminal enforcement of the Sherman Act is inappropriate unless the defendants have deliberately violated the law.[1] I adhere to that view today. But since 1890 when the Sherman Act was enacted, the statute has had the same substantive reach in criminal and civil cases. No matter how wise the new rule that the Court adopts today may be, I believe it is an amendment only Congress may enact.

If I were fashioning a new test of criminal liability, I would require proof of a specific purpose to violate the law rather than mere knowledge that the defendants' agreement has had

[1] Report of the Attorney General's National Committee to Study the Antitrust Laws 349–351 (1955).

an adverse effect on the market.[2]   Under the lesser standard adopted by the Court, I believe MR. JUSTICE REHNQUIST is quite right in viewing the error in the trial judge's instructions as harmless.   *Ante,* at 471–473.   There is, of course, a theoretical possibility that defendants could engage in a practice of exchanging current price information that was sufficiently prevalent to have had a marketwide impact that they did not know about, but as a practical matter that possibility is surely remote.

Finally, I am afraid that the new civil-criminal dichotomy may work mischief in the civil enforcement of the prohibition against tampering with prices in a free market.   Conclusive presumptions play a central role in the enforcement, both civil and criminal, of the Sherman Act.   Thus, an agreement to charge the same price,[3] or to adopt a common purchasing policy that determines the market price,[4] is unreasonable, and therefore unlawful, without any proof of the purpose or the actual effect of the agreement.   The law presumes that those who entered the price-fixing agreement knew that forbidden effects would follow, and it also presumes, conclusively, that those effects will follow.   In a criminal prosecution for price fixing in violation of the Sherman Act it is, therefore, irrelevant whether the prices fixed were reasonable or whether the defendant's intentions were good.[5]   See *United States* v.

---

[2] The distinction between the two standards is explained *ante,* at 444–445. The Report of the Attorney General's Committee recommended that "criminal process should be used only where the law is clear and the facts reveal a flagrant offense and plain intent unreasonably to restrain trade." Report, *supra* n. 1, at 349.

[3] *United States* v. *Trenton Potteries Co.,* 273 U. S. 392.

[4] *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150.

[5] In fact, early in the development of criminal enforcement of the Sherman Act, this Court stated:

"[T]he conspirators must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily

*Trenton Potteries Co.,* 273 U. S. 392. As Mr. Justice Stone explained for the Court in that case, "the Sherman law is not only a prohibition against the infliction of a particular type of public injury. It 'is a limitation of rights, . . . which may be pushed to evil consequences and therefore restrained.'" *Id.,* at 398 (citation omitted).

To be sure, cases such as *Trenton Potteries* involved conduct that was determined to be illegal on its face, while in this case the trial court appraised respondents' agreement under "rule of reason" analysis.[6] But properly understood, rule-of-reason analysis is not distinct from *"per se"* analysis. On the contrary, agreements that are illegal *per se* are merely a species within the broad category of agreements that unreasonably restrain trade; less proof is required to establish their illegality, but they nonetheless violate the basic rule of reason.[7]

As applied to an agreement among major producers to exchange current price information, the rule of reason requires an element in addition to proof of the agreement itself—either an actual market effect or an express purpose to affect market price—but once that element is shown, any additional showing of intent is unnecessary. See *United States* v. *Container Corp.,* 393 U. S. 333. The rule is premised on the assumption that if the practice of exchanging current price information is sufficiently prevalent to affect the market price, then there is

---

and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result." *United States* v. *Patten,* 226 U. S. 525, 543.

[6] An argument can be made that an agreement among the major producers in the market to exchange current price information should be considered illegal on its face. As the Court points out, "[e]xchanges of current price information . . . have the greatest potential for generating anticompetitive effects and . . . have consistently been held to violate the Sherman Act." *Ante,* at 441 n. 16.

[7] Rahl, Price Competition and the Price Fixing Rule—Preface and Perspective, 57 Nw. L. Rev. 137, 139 (1962).

an extremely high probability that the sales representatives of these companies had actual knowledge of that fact. Given the language of § 1, that premise is as valid in the context of a criminal prosecution as it is in the context of a treble-damages civil action.

Accordingly, although I agree with much of the abstract discussion in Part II of the Court's opinion, I concur only in Parts I, III, IV, and V, and in the judgment.